## In the United States District Court
### for the
### Western District of Texas

| | | |
|---|---|---|
| GUADALUPE BETANCOURT, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | Civil Action No. SA-10-CV-029-XR |
| | § | |
| INGRAM PARK MALL, L.P., | § | |
| | § | |
| *Defendant.* | § | |

### ORDER

On this date, the Court considered Defendant's Motion to Dismiss (docket no. 7), and the Response (and Supplement) and Reply thereto.

### I. Background

Plaintiff Guadalupe Betancourt, a Kansas resident, filed her original complaint against Defendant Ingram Park Mall on January 15, 2010, seeking declaratory and injunctive relief, attorney's fees, litigation expenses, and costs under Title III of the Americans with Disabilities Act ("ADA").  In her Complaint, Plaintiff alleges that she is mobility impaired and uses a wheelchair.  She alleges that she visited Ingram Park Mall ("the property"), located in Bexar County, Texas, and plans to return there to avail herself of the goods and services offered to the public and to determine whether the property has been made ADA compliant.  Plaintiff further alleges that, when visiting the property, she encountered architectural barriers that discriminate against her on the basis of her disability and have endangered her safety, and that these barriers prevent her from returning to the property to enjoy the available goods and services.  Plaintiff contends that she has suffered and will

1

continue to suffer injury until Defendant is compelled to make its property ADA compliant.

On March 29, Defendant moved to dismiss Plaintiff's action under Rule 12(b)(1) for lack of jurisdiction and under Rule 12(b)(6) for failure to state a claim. In the motion, Defendant contends that this Court lacks jurisdiction over Plaintiff's Title III claim because Plaintiff lacks standing. Specifically, because Plaintiff resides in Kansas and seeks only declaratory and injunctive relief (the only type of relief available for Title III violations), Defendant asserts that she cannot demonstrate a real threat of future harm from Defendant's alleged ADA violations and thus lacks standing. In the alternative, Defendant moves for dismissal on the basis that Plaintiff has failed to state a claim. Defendant contends that Plaintiff's Complaint contains only conclusory allegations and formulaic recitations "not entitled to the assumption of truth."

Plaintiff filed her Response on April 26, as well as an Amended Complaint. Because Plaintiff filed an Amended Complaint,[1] it is the operative pleading for purposes of the motion to dismiss. Plaintiff also filed an Affidavit to supplement her Response on May 1. Defendant filed its Reply on May 7.

In her Amended Complaint, Plaintiff seeks declaratory and injunctive relief, attorney's fees,

---

[1] Rule 15 allows a plaintiff to file an amended complaint as of right within 21 days after service of a motion under Rule 12(b); otherwise, leave of court or written consent of the defendant is required. Though Plaintiff's Amended Complaint was filed more than 21 days after service of the motion, Plaintiff sought and was granted an extension of time to respond to the motion to dismiss, and Plaintiff apparently construed that as also being an extension of the Rule 15 deadline. In any event, if leave of Court was required, it is now granted, as the Rule 15 factors are met and Defendant has not objected to the filing of the Amended Complaint. In fact, in its Reply, Defendant asserts that the motion to dismiss must be applied to the Amended Complaint rather than dismissed as moot. However, Defendant also contends that the filing of the Amended Complaint mooted Plaintiff's Response to the motion to dismiss and the affidavit, and that these "are no longer germane to the issue of whether Plaintiff has standing because Plaintiff filed the First Amended Complaint." However, Defendant cannot have it both ways. Either both the motion and response are moot, or both may be considered. The Court will do the latter.

litigation expenses, and costs under Title III of the ADA "on her behalf and on behalf of all other individuals similarly situated."   She alleges that Ingram Park Mall is a place of public accommodation, that she has visited the property, and that she "plans to return to avail herself of the goods and services offered to the public at the property, and to determine whether the property has been made ADA compliant."   Am. Compl. ¶¶ 5, 7.   Plaintiff alleges that she encountered architectural barriers that discriminate against her on the basis of her disability and endangered her safety.   *Id.*   Plaintiff alleges that she "has suffered and will continue to suffer direct and indirect injury as a result of Defendant's discrimination until the Defendant is compelled to comply with the requirements of the ADA."   *Id.* ¶ 6.   Plaintiff further alleges that she has "a realistic, credible, existing and continuing threat of discrimination from the Defendant's non-compliance with the ADA with respect to this property as described but not necessarily limited to the allegations contained in paragraph 10."   *Id.* ¶ 8.   She asserts that she has "reasonable grounds to believe that she will continue to be subjected to discrimination in violation of the ADA by the Defendant."   *Id.*   She alleges that she "desires to visit Ingram Park Mall not only to avail herself of the goods and services available at the property but [also] to assure herself that this property is in compliance with the ADA so that she and others similarly situated will have full and equal enjoyment of the property without fear of discrimination."   *Id.*

Plaintiff alleges that Defendant is in violation of the ADA by failing to have accessible facilities, and lists various deficiencies in parking, entrance access and path of travel, access to goods and services, and restrooms.   *Id.* ¶ 10.   Plaintiff asserts that these violations are non-exhaustive, and that she requires an inspection to measure "all of the discriminatory acts violating the ADA."   *Id.* ¶ 11.   Plaintiff alleges that she "and all others similarly situated have been denied

3

access to and have been denied the benefits and services, programs and activities of the Defendant's buildings and facilities, and have otherwise been discriminated against and damaged by the Defendant because of the Defendant's ADA violations, as set forth above." *Id.* ¶ 11.  Plaintiff further contends that Defendant has "discriminated against the Plaintiff by denying her access to full and equal enjoyment of the goods, services, facilities, privileges, advantages and/or accommodations of its place of public accommodation or commercial facility in violation of 42 U.S.C. § 12181 et seq. and 28 C.F.R. 36.302 et seq." and "continues to discriminate against the Plaintiff and all those similarly situated by failing to make reasonable accommodations in policies, practices, or procedures, when such modifications are necessary to afford all offered goods, services, facilities, privileges, advantages or accommodations to individuals with disabilities; and by failing to take such efforts that may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services." *Id.* ¶ 12.

Plaintiff prays for a declaratory judgment that Defendant is in violation of Title III, injunctive relief "including an order to make all readily achievable alterations to the facility or to make such facility readily accessible to and usable by individuals with disabilities to the extent required by the ADA and to require the Defendant to make reasonable modifications in policies, practices or procedures, when such modifications are necessary to afford all offered goods, services, facilities, privileges, advantages or accommodations to individuals with disabilities,"[2] and attorneys' fees.

---

[2] As part of this sentence, Plaintiff also includes language regarding auxiliary aids and services that appears to have been cut and pasted from the body of the Complaint, as it re-alleges that Defendant has failed to provide auxiliary aids and services rather than seeking declaratory relief regarding that failure.  However, as will be discussed later, Plaintiff's Complaint and Amended Complaint fail to state a claim with regard to any allegedly discriminatory policies, practices, or

In her Affidavit, submitted as a supplement to her response to Defendant's motion to dismiss, Plaintiff states that she frequently travels to San Antonio to visit family, and that she is also a disability rights advocate and a "tester." Plaintiff states that she visited the Mall in June 2009 and encountered a number of "barriers and violations," which are listed and accompanied by photographs.[3] She further states that she intends to return to the San Antonio area in the Summer of 2011 to visit her family and survey places of public accommodation and assert her civil rights. With regard to the Mall, she states:

> I am aware that it would be a futile gesture to visit Defendant's facility unless and until it is brought into compliance with the Americans Disability Act [*sic*]. I intend to return to Defendant's property next summer for a planned family visit, but I have no desire to suffer further discrimination. Presently, I am aware that I am being denied the opportunity to visit Defendant's property and enjoy the same goods, advantages, benefits and services available to the non-disabled public. I am aware that I presently lack the civil right to visit Defendant's property free of discrimination. I do not know when the Defendant will fix its ADA violations, and therefore am prevented by Defendant from making plans to visit its premises and shop again at its facility. As soon as I learn that Defendant is compliant with the ADA, and that I have the opportunity to visit the premises free of discrimination, I will visit the property.

## II. Standard of Review

Defendant moves to dismiss pursuant to Rule 12(b)(1) based on Plaintiff's asserted lack of standing. The Court must dismiss a cause for lack of subject matter jurisdiction "when the court lacks the statutory or constitutional power to adjudicate the case." *See Home Builders Ass'n of Mississippi, Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998). In deciding a motion to

---

procedures and any alleged failure to provide auxiliary aids and services. Thus, this Order will focus primarily on Plaintiff's allegations regarding architectural barriers.

[3] The Court also takes judicial notice of Plaintiff's Affidavit filed in another case pending before this Court. In Betancourt v. Federated Department Stores, SA:09-cv-856, Plaintiff filed an affidavit stating that she visited the Macy's in Ingram Park Mall on March 29, 2009.

dismiss pursuant to Rule 12(b)(1), the Court may consider: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts, plus the Court's resolution of disputed facts. *Freeman v. United States*, 556 F.3d 326, 334 (5th Cir. 2009). When a motion to dismiss is based on the lack of jurisdiction on the face of the complaint, the plaintiff is left with safeguards similar to those retained when a Rule 12(b)(6) motion to dismiss for failure to state a claim is raised – the court will consider the allegations in the plaintiff's complaint as true. *Williamson v. Tucker*, 645 F.2d 404, 412 (5th Cir. 1981).

"[T]he irreducible constitutional minimum of standing contains three elements." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). These elements are "(1) an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent; (2) a causal connection between the injury and the conduct complained of; and (3) the likelihood that a favorable decision will redress the injury." *Croft v. Governor of Texas*, 562 F.3d 735, 745 (5th Cir. 2009) (citing *Lujan*, 504 U.S. at 560-61). Particularized means "that the injury must affect the plaintiff in a personal and individual way." *Lujan*, 504 U.S. at 560 n.1. "The party invoking federal jurisdiction bears the burden of establishing these elements." *Lujan*, 504 U.S. at 561. Since they are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation. *Id.* At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we "presum[e] that general allegations embrace those specific facts that are necessary to support the claim." *Lujan*, 504 U.S. at 561; *Public Citizen, Inc. v. Bomer*,

274 F.3d 212, 218 (5th Cir. 2001).

Defendant also moves to dismiss under Rule 12(b)(6) for failure to state a claim.   In considering a motion to dismiss under 12(b)(6), all factual allegations from the complaint should be taken as true.   *Fernandez-Montez v. Allied Pilots Assoc.*, 987 F.2d 278, 284 (5th Cir. 1993). Courts may look only to the pleadings in determining whether a plaintiff has adequately stated a claim; consideration of information outside the pleadings converts the motion to one for summary judgment.   FED. R. CIV. P. 12(d).   To survive a 12(b)(6) motion, a complaint must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."   *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).   Factual allegations must be sufficient to "raise a right to relief above the speculative level."   *Id.*   A well-pleaded complaint can survive a motion to dismiss even if actual proof of the facts alleged is "improbable."   *Id.* at 556.

### III. Analysis

**A. The ADA and Title III – overview, requirements, and remedies**

The ADA was passed in 1990 with the declared purposes of providing "a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities" and providing "clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities." 42 U.S.C. § 12101(b).   Recognizing that people with disabilities historically faced discrimination in a number of areas, Congress included its in its findings the following: (1) "many people with physical or mental disabilities have been precluded [from fully participating in society] because of discrimination,"(2) "historically, society has tended to isolate and segregate individuals with disabilities," and (3) "discrimination against individuals with disabilities persists in such critical areas as employment, housing, public accommodations,

7

education, transportation, communication, recreation, institutionalization, health services, voting, and access to public services."  42 U.S.C. § 12101(a). Congress found that "individuals with disabilities continually encounter various forms of discrimination, including . . . the discriminatory effects of architectural, transportation, and communication barriers . . . and relegation to lesser services, programs, activities, benefits, jobs, or other opportunities," and asserted that "the Nation's proper goals regarding individuals with disabilities are to assure the equality of opportunity, full participation, independent living, and economic self-sufficiency for such individuals."  42 U.S.C. § 12101(a).

Title III of the ADA prohibits discrimination against persons with disabilities by places of public accommodation and services operated by private entities, including retail establishments. Section 12181 broadly pronounces the "general rule" that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation."  42 U.S.C. § 12182(a).  It then includes both "general" and "specific" prohibitions.  The "general prohibition" against discrimination in activities provides that it shall be discriminatory to (1) subject disabled persons, on the basis of disability, "to a denial of the opportunity . . . to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations of an entity," (2) afford disabled persons, on the basis of disability, an unequal benefit to that afforded others, or (3) provide a good, service, facility, privilege, advantage, or accommodation that is different or separate from that provided to other individuals, unless such action is necessary to provide the disabled individuals with a good, service, facility, privilege, advantage, or accommodation, or other opportunity that is

as effective as that provided to others.  42 U.S.C. § 12182(b)(1).

The "specific prohibitions" provide that, "[f]or purposes of subsection (a), discrimination includes (i) the imposition or application of eligibility criteria that screen out or tend to screen out an individual with a disability . . . unless such criteria can be shown to be necessary . . . (ii) a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations; (iii) a failure to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services, unless the entity can demonstrate that taking such steps would fundamentally alter the nature of the good, service, facility, privilege, advantage, or accommodation being offered or would result in an undue burden; (iv) a failure to remove architectural barriers, and communication barriers that are structural in nature, in existing facilities; and (v) where an entity can demonstrate that the removal of a barrier under clause (iv) is not readily achievable, a failure to make such goods, services, facilities, privileges, advantages, or accommodations available through alternative methods if such methods are readily achievable." 42 U.S.C. § 12182(b)(2)(A).

Though the application of Title III is broad, the remedies available to injured parties are limited.  *See* Ruth Colker, *ADA Title III: A Fragile Compromise*, 21 BERKELEY J. EMP. & LAB. L. 377 (2000) (noting that "[i]n return for a broad list of covered entities, civil rights advocates agreed to a limited set of remedies under ADA Title III.").  "Remedies available under Title III of the ADA

9

are the same as those under Title II of the Civil Rights Acts of 1964, 42 U.S.C. § 2000, for which there is only injunctive relief." *Frame v. City of Arlington*, 575 F.3d 432, 438 n.5 (5th Cir. 2009).[4] The Supreme Court has stated that suits under 204(a) of the Civil Rights Act of 1964, 42 U.S.C. § 2000a-3(a), the provision creating a private right of action to enforce Title II of the Act, and which deals with discrimination in public accommodations, are "private in form only." *Guardians Ass'n v. Civil Service Comm'n*, 463 U.S. 582 (1983).  "When a plaintiff brings an action under that Title, he cannot recover damages.  If he obtains an injunction, he does so not for himself alone but also as a 'private attorney general,' vindicating a policy that Congress considered of the highest priority." *Id.* (citing *Newman v. Piggie Park Enterprises*, 390 U.S. 400, 401-02 (1968)).  "It is fair to assume that Congress had the same understanding when it enacted Title III of the ADA." *Dudley v. Hannaford Bros. Co.*, 333 F.3d 299, 307 (1st Cir. 2003).

Under the terms of the ADA, injunctive relief is available "to any person who is being subjected to discrimination on the basis of disability in violation of [Title III]."  42 U.S.C. § 12188(a)(1).  "In the case of violations of sections 12182(b)(2)(A)(iv) [architectural barriers] . . ., injunctive relief shall include an order to alter facilities to make such facilities readily accessible to and usable by individuals with disabilities to the extent required by [Title III]." *Id.* § 12188(a)(2). Section 12188 expressly states that "[n]othing in this section shall require a person with a disability to engage in a futile gesture if such person has actual notice that a person or organization covered by this subchapter does not intend to comply with its provisions." *Id.*

The ADA also permits enforcement by the Attorney General if there is reasonable cause to

---

[4]"The remedies and procedures set forth in section 2000a-3(a) of [Title 42 U.S.C.] are the remedies and procedures [Title III] provides to any person who is being subjected to discrimination . . . ." 42 U.S.C. § 12188.

believe that there is a "pattern or practice of discrimination" or a person or group of persons has been discriminated against "and such discrimination raises an issue of general public importance." 42 U.S.C. § 12188(b)(1)(B). However, the Attorney General has limited resources, and thus "private suits by necessity represent the main tool for ensuring compliance with Congress's intent in passing the ADA." Kelly Johnson, Note, *Testers Standing Up for Title III of the ADA*, 59 CASE W. RES. L. REV. 683, 710 (2009). As a result of both the Attorney General's limited resources and the limited remedies available to Title III plaintiffs, "most ADA suits are brought by a small number of private plaintiffs who view themselves as champions of the disabled." *Molski v. Evergreen Dynasty Corp.*, 500 F.3d 1047, 1062 (9th Cir. 2007).

**B. *Lyons* and *Lujan***

"Any person who is being subjected to discrimination based on disability in violation of" Title III has a cause of action, but whether a plaintiff has a cause of action is a distinct issue from whether she has standing under Article III. *See Davis v. Passman*, 442 U.S. 228, 239 n.18 (1979) (noting the difference between having a cause of action and standing). Thus, because a federal plaintiff must demonstrate standing for each type of relief sought, and the relief available to a Title III ADA plaintiff is injunctive relief, a plaintiff must satisfy the Article III standing requirements for injunctive relief. The Supreme Court has never addressed Article III standing requirements for Title III suits. Many federal courts deciding standing issues under the ADA Title III rely primarily on *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983) and *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992), which involved very different factual scenarios.

In *Lyons*, the Supreme Court found that the plaintiff lacked standing to seek declaratory and injunctive relief prohibiting the City's police department from using chokeholds because of "the

speculative nature of Lyons' claim of future injury." *Lyons*, 461 U.S. at 111.  The Court held that a "plaintiff must show that he 'has sustained or is immediately in danger of sustaining some direct injury' as the result of the challenged official conduct and the injury or threat of injury must be both 'real and immediate,' not 'conjectural' or 'hypothetical.'" *Lyons*, 461 U.S. at 102.  The Court stated that "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects," though "[p]ast wrongs [are] evidence bearing on 'whether there is a real and immediate threat of repeated injury.'" *Id.* (quoting *O'Shea v. Littleton*, 414 U.S. 488 (1974)).  Though it stated these broad principles, the finding of no standing in *Lyons* rested on specific conclusions, including that (1) Lyons had done nothing to establish a real and immediate threat that he would again be stopped for a traffic violation or for any other offense by an officer or officers who would illegally choke him into unconsciousness without any provocation or resistance on his part (in fact, the Court noted its holding in a prior case that it would presume that the plaintiff would behave lawfully); (2) the need for a proper balance between state and federal authority counsels restraint in the issuance of injunctions against state officers engaged in the administration of the states' criminal laws in the absence of irreparable injury which is both great and immediate; and (3) withholding injunctive relief did not mean that the federal law would exercise no deterrent effect in the circumstances because Lyons had a damages remedy for his injury.

*Lujan* involved a challenge by environmental group plaintiffs to a regulation issued by the Secretary of the Interior that interpreted § 7 of the Endangered Species Act "in such fashion as to render it applicable only to actions within the United States or on the high seas." *Lujan*, 504 U.S. at 558.  The plaintiff wildlife conservation and environmental groups sought a declaratory judgment

that the regulation was erroneous and an injunction requiring the Secretary to promulgate a new regulation. *Id.* at 559. The Court emphasized at the outset of the opinion that "[w]hen the suit is one challenging the legality of government action or inaction, the nature and extent of facts that must be . . . proved in order to establish standing depends considerably upon whether the plaintiff is himself an object of the action (or foregone action) at issue" and when "a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else*, much more is needed." *Id.* at 561-62. The Court held that, to survive summary judgment, the plaintiffs had to submit evidence showing through specific facts, "not only that the listed species were in fact being threatened by funded activities abroad, but also that one or more of respondents' members would thereby be 'directly' affected apart from their 'special interest' in the subject." *Id.* at 563. The Court noted that the plaintiffs had no specific future plans to go abroad and observe the endangered species, "[a]nd the affiants' profession of an 'intent[t]' to return to the places they had visited before – where they will presumably, this time, be deprived of the opportunity to observe animals of the endangered species – is simply not enough." *Id.* at 564. It held that "[s]uch 'some day' intentions – without any description of concrete plans, or indeed even any specification of *when* the some day will be – do not support a finding of the 'actual or imminent' injury that our cases require." *Id.* Thus, it was "beyond the limit" and "into pure speculation" to say "that anyone who observes or works with an endangered species, anywhere in the world, is appreciably harmed by a single project affecting some portion of that species with which he has no more specific connection." *Id.*

## C. Courts applying *Lyons* and *Lujan* to find no standing

A number of courts have applied *Lyons* and *Lujan* to hold that a plaintiff lacks standing to

seek injunctive relief under Title III unless she alleges a concrete, particularized, and credible plan to return to the public accommodation that is currently discriminating against her on a specific future date. These courts hold that the likelihood of future injury is measured by "whether the plaintiff is likely to return to the defendant's business." *Access4All, Inc. v. Wintergreen Commercial*, Civ. A. No. 3:05-CV-1307, 2005 WL 2989307 at *3 (N.D. Tex. Nov. 7, 2005). And, whether these courts find that a plaintiff is likely to return to the allegedly discriminatory business is determined by considering "such factors as: (1) the proximity of the defendant's business to the plaintiff's residence, (2) the plaintiff's past patronage of the defendant's business, (3) the definitiveness of the plaintiff's plans to return, and (4) the plaintiff's frequency of travel near the defendant." *Id.*

**D. Commentary**

The "concrete plan to return" approach, which is espoused by Defendant in this case, has been repeatedly criticized by commentators. In 2000, Ruth Colker wrote that "[c]ourts that have applied *Lyons* to ADA Title III cases have applied the [standing] doctrine too stringently and have arguably misconstrued the nature of these Title III actions." Colker, *supra* at 397. Distinguishing *Lyons*, Colker noted that ADA Title III "cases do not involve extreme situations in which only a plaintiff's criminal conduct could cause future discrimination to occur," but instead "these are cases in which plaintiffs represent a class of litigants who repeatedly face instances of discrimination as a result of their own voluntary and lawful conduct." *Id.*

In 2002, Elizabeth Keadle Markey noted that "[m]any courts have relied on tenuous analogies to, and narrow interpretations of, judicially-created standing doctrine in deciding whether a plaintiff has standing under the ADA" and advocated "greater vigilance on the part of the courts to ensure that persons who suffer disability discrimination do have standing to bring their claims."

14

Elizabeth Keadle Markey, *The ADA's Last Stand?: Standing and the Americans With Disabilities Act*, 71 FORDHAM L. REV. 185, 186 (October 2002).

In 2004, Professor Adam Milani surveyed the case law, noting that "[t]he generating force for ADA compliance of private suits will be blunted . . . if courts persist in holding that plaintiffs do not have standing to remedy violations such as inaccessible buildings or the refusal to change policies regarding the provisions of services or auxiliary aids to people with disabilities." He recognized that "[b]y their very nature, such violations are ongoing and not isolated occurrences." Adam A. Milani, *Wheelchair Users Who Lack "Standing": Another Procedural Threshold Blocking Enforcement of Titles II and III of the ADA*, 39 WAKE FOREST L. REV. 69, 113 (Spring 2004). Professor Milani argued that allowing standing in most Title II and III cases is actually consistent with the holdings in *Lyons* and *Lujan*. He notes that "the 'odds' of the injury recurring are certain where a building is not in compliance with the ADA," and that the plaintiff and "every other person with the same disability" will confront the same barrier on every future visit. *Id.* He further argued that disabled plaintiffs need not establish imminent future injuries because "they have an actual and present injury – they are currently deterred from visiting a building." *Id.* at 117-18.

And recently, Kelly Johnson wrote that "[c]ourts are mistaken in applying Lyons and Lujan to prevent standing to ADA testers" because "the [Supreme] Court's rationale for denying standing in the cases is inapplicable to ADA testers." Johnson, *supra* at 712. Discussing standing specifically in the context of ADA testers, Johnson notes that the "suit is in court because the defendant refuses to make the necessary changes, so there is little doubt a plaintiff would be subjected to the harm if he or she were to return" and "testers can plausibly claim that they will return to the place of violation, which is different from claiming that police will choke you or that

15

you plan on traveling to a faraway country to see exotic animals." *Id*. She asserts that "a tester's assertions that he or she plans to return to a public accommodation are quite likely true, because the tester would probably be the first person to make sure the changes were made for compliance" and "no precedent says that a plaintiff's intent to return cannot be motivated in some way to advance his/her lawsuit." *Id.* at 712-13. Johnson contends that "[c]ourts that use *Lyons* and *Lujan* as grounds to deny standing are interpreting the cases to stand for principles those decisions do not endorse and are applying the cases far too stringently." *Id.* at 714.

**E. Broader Views of Title III Injury and Standing**

Other courts and judges have taken a broader approach to Article III standing for injunctive relief in Title III cases. Criticizing the majority's finding of no standing based on the plaintiff's failure to allege a specific date in the future on which he would return to defendant's facility, Judge Barkett wrote:

> Especially in the disability context, a "specific-date/set-plans" standard would produce patently absurd results, and would almost certainly place plaintiffs in a Catch-22 so far as their credibility is concerned. To have standing under the ADA, is a wheelchair-bound individual who consistently but unpredictably frequents a particular Burger King required to predict the very day on which he will next crave a Whopper?

*Access v. America v. Associated Out-Door*, 188 Fed. App'x 818 at *2 (11th Cir. 2006) (Barkett, J., dissenting). He also noted that the Eleventh Circuit had previously held that an allegation that the plaintiff would return to the public accommodation "soon" was sufficient. *See Stevens v. Premier Cruises*, 215 F.3d 1237 (11th Cir. 2000).

Some courts have also recognized that the Title III ADA plaintiff's injury may be broader than the injury suffered by the direct interaction with architectural barriers. Consistent with the express language of the ADA, these courts recognize that plaintiffs need not engage in the "futile

gesture" of alleging an intent to return to a place before it is made ADA-compliant.

The Eighth Circuit in *Steger v. Franco*, 228 F.3d 889 (8th Cir. 2000), though applying *Lyons* and *Lujan*, nevertheless found that a plaintiff who had suffered past injury had standing to sue a building owner to compel compliance with the ADA.  The building provided office and retail space for health care providers and other retail and service establishments.  The Eighth Circuit held that the plaintiffs had to satisfy the general requirements set forth in *Lyons* and *Lujan*, including injury-in-fact and redressability.  Regarding injury-in-fact, the Court held that "[a]lthough plaintiffs need not engage in the 'futile gesture' of visiting a building containing known barriers that the owner has no intention of remedying, see 42 U.S.C. § 12188(a)(1), they must at least prove knowledge of the barriers and that they would visit the building in the imminent future but for those barriers."  *Steger*, 228 F.3d at 892.  The Court did not require the plaintiff to allege a specific and concrete plan to return to the building before it was made ADA-compliant.

In *Pickern v. Holiday Quality Foods, Inc.*, 293 F.3d 1133 (9th Cir. 2002), the Ninth Circuit also recognized that the deterrent effect of discriminatory conditions is an ongoing injury sufficient to confer standing.  The court held that, "under the ADA, once a plaintiff has actually become aware of discriminatory conditions existing at a public accommodation, and is thereby deterred from visiting or patronizing that accommodation, the plaintiff has suffered an injury," and "[s]o long as the discriminatory conditions continue, and so long as a plaintiff is aware of them and remains deterred, the injury under the ADA continues."  *Id.* at 1136-37.  Accordingly, allegations that "[the plaintiff] has visited [defendant's] store in the past and states that he has actual knowledge of the barriers to access at that store" and that plaintiff "prefers to shop at Holiday markets and that he would shop at the Paradise market if it were accessible" were sufficient to establish actual or

imminent injury for purposes of standing.  *Id.* at 1138.

The Ninth Circuit reaffirmed this position in subsequent cases, noting that "[t]he Supreme Court has instructed us to take a broad view of constitutional standing in civil rights cases, especially where, as under the ADA, private enforcement suits 'are the primary method of obtaining compliance with the Act.'"  *Doran v. 7-Eleven*, 524 F.3d 1034, 1039 (9th Cir. 2008).

The First Circuit found a plaintiff's allegations similar to the allegations in this case to be sufficient to confer standing at the pleading stage in *Disabled Americans for Equal Access, Inc. v. Ferries Del Caribe, Inc.*, 405 F.3d 60, 64 (1st Cir. 2005).  The plaintiff alleged that he had visited defendant's cruise ship and been subjected to discrimination, that he intended to return to the cruise vessel to avail himself of the goods and services thereon, and that the barriers had denied and diminished his ability to visit and/or use the property and had endangered his safety and the safety of other disabled persons.  *Id.* at 65.  The court expressly held that the plaintiff did not have to engage in the futile gesture of actually traveling aboard the vessel again to establish standing.  *Id.* at 65 n.7.

## F.  Fifth Circuit decisions

The Fifth Circuit has not expressly considered the proper approach to determining standing in the typical Title III case.  In fact, this Court has located only one published Fifth Circuit case discussing standing in a Title III case – *Plumley v. Landmark Chevrolet, Inc.*, 122 F.3d 308 (5th Cir. 1997).  In *Plumley*, the standing issue was not a difficult one given that the plaintiff had died, rendering any continuing or future injury impossible.  In that case, Plumley's son arranged to buy a used truck from the defendant, Landmark Chevrolet, and Plumley was to act as guarantor.  When the sales person/manager learned that Plumley was HIV+, he refused to sell the car to Plumley's son.

18

Plumley thereafter died and his wife was substituted as the plaintiff, and Plumley's son bought a truck elsewhere. The Fifth Circuit dismissed the ADA claim, reasoning:

> [A] plaintiff seeking injunctive relief based on an alleged past wrong must show that there is a real or immediate threat that he will be wrong again. Appellant cannot meet this threshold. Plumley has died and his son bought another truck. It is unlikely that Landmark will wrong Plumley again.

*Plumley*, 122 F.3d at 312.

However, in the more typical situation in which the plaintiff remained alive and a discriminatory policy remained in place, the Fifth Circuit affirmed the district court's order for injunctive relief concerning a brewery's policy on service animals. *Johnson v. Gambrinus Company/Spoetzl Brewery*, 116 F.3d 1052 (5th Cir. 1997). Recognizing that the policy against allowing service dogs on the brewery tour affected more than just the plaintiff in that case, the district court issued an injunction requiring the brewery to ensure that "disabled persons with guide dogs or other service animals have the broadest feasible access to the public tour." The Fifth Circuit affirmed without raising the issue of standing or requiring the plaintiff in that case to allege an intent to return.[5]

The Fifth Circuit has also issued two unpublished cases discussing standing in Title III cases. In *Bynum v. American Airlines*, 166 Fed. App'x 730 (5th Cir. 2006), the Court indicated that a disabled plaintiff had standing to sue airlines on which he had flown, without requiring proof that he would be wronged by these airlines again on a specific date. In *Jolly v. Pappas Restaurant, Inc.*, 189 F.3d 467 (5th Cir. 1999), the plaintiff was allegedly denied service at the defendant's restaurant.

---

[5] The Court notes that, requiring a plaintiff to allege an intent to return to such a tour, which persons generally visit only once, would likely render the ADA wholly ineffective with regard to such types of destinations. As the courts recognized in *Johnson*, injunctive relief was appropriate to remedy the discrimination for all similarly situated individuals.

The Fifth Circuit stated that the fact that the defendant restaurant had denied the plaintiff service in the past was an insufficient basis for injunctive relief, and that the plaintiff must show a real or immediate threat that he would be wronged again.  The Court found that he could not do so, however, because the defendant restaurant had indicated that the plaintiff was welcome at his restaurant.  The case did not involve any ongoing architectural barriers.[6]

## G. Synthesis – Defining Injury Under Title III of the ADA

Modern Supreme Court jurisprudence on standing requires an "injury in fact."  It is settled law that "[w]here federal statutory rights are at issue . . . Congress has considerable authority to shape the assessment of standing."  *Kyles v. J.K. Guardian Security Servs.*, 222 F.3d 289, 294 (7th Cir. 2000).   "[A]lthough it may not lower the threshold for standing below the minimum requirements imposed by the Constitution, Congress can extend standing to the outermost limits of Article III."  *Id.* (citation omitted).  Further, Congress has the power to "enact statutes creating legal rights, the invasion of which creates standing, even though no injury would exist without the statute."  *Id.* (citing *Linda R.S. v. Richard D.*, 410 U.S. 614, 617 n.3 (1973)).  Thus, "whether a person has Article III standing to sue under [a particular statute] depends in great measure on the

---

[6] Though the Fifth Circuit has applied *Lyons* in the Title I context to require an employment plaintiff to allege a likelihood that he would be subjected to a similar violation in the future, its facts are distinguishable.  In *Armstrong v. Turner Industries, Inc.*, 141 F.3d 554 (5th Cir. 1998), the plaintiff, who was not disabled, sought to challenge a violation of section 12112(d)(2)(A), which provides that a covered entity shall not conduct a medical examination or make inquiries of a job applicant concerning their disability until a conditional offer of employment has been extended.  The Court held that, because the plaintiff did not indicate that he planned to seek employment with the company again, nor did he "purport to represent a specific class of individuals that is in danger of discrimination from [defendant]," he lacked standing.  *Id.* at 563.  Persons who are disabled, however, do represent a specific class of individuals in danger of discrimination by the defendant when the defendant violates Title III.  Further, in Title III cases, so long as the plaintiff remains disabled and the barrier remains in place, the discrimination is ongoing.

particular rights conferred by th[at] statute[]." *Id.* It follows that whether a plaintiff has suffered an injury in fact sufficient to confer standing under Title III is determined largely by the rights conferred by the ADA.

In the case of architectural barriers, courts finding a lack of standing unless the plaintiff alleges or proves a concrete plan to return to an establishment to suffer discrimination view the Title III injury as being limited to the plaintiff's actual interactions with the discriminatory barriers at the establishment. While this is undoubtedly an injury under Title III, it is not the only type of injury, and therefore not the only type of discrimination, prohibited by Title III. Rather, the ADA expressly contemplates loss of opportunity as an actionable injury. Congress included within the Act the stated goal of assuring "equality of opportunity" to disabled persons 42 U.S.C. § 12101(a). The ADA provides a cause of action to "any person who is being subjected to discrimination" and expressly states that "it shall be discriminatory to subject an individual . . . on the basis of disability . . . *to a denial of the opportunity* of the individual or class to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations of an entity." 42 U.S.C. § 12182(a), (b) (emphasis added). A disabled plaintiff may be denied the opportunity to participate in or benefit from the goods and services, which is among the ADA's general prohibitions, in a number of ways, including a defendant's "failure to remove architectural barriers," which is among the specific prohibitions listed in § 12182(b). Thus, the disabled plaintiff suffers an ongoing injury so long as she is effectively denied the opportunity to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations of the entity. That Congress meant to restore disabled plaintiffs' choice and opportunity to visit an establishment on equal footing with the able bodied is further evident in the title of Chapter 126 – "Equal Opportunity for Individuals

with Disabilities."

Recognizing this, some courts (as noted previously) have appropriately held that the Title III injury includes the deterrent effect that architectural barriers or other Title III violations have on the plaintiff.  While a flight of stairs at a store's entrance is an obvious deterrent to a person in a wheelchair, less-obvious barriers also deter disabled patrons from vising an establishment.  For example, a wheelchair user may reasonably avoid going to a restaurant or bar she would otherwise visit because it lacks an accessible bathroom, or may avoid shopping at a store if the aisles are too narrow to navigate.  The fact that the disabled person is being deterred from visiting an establishment they would otherwise visit, even if infrequently, is an ongoing, present injury.  Thus, a plaintiff need not engage in the futile gesture of visiting an accommodation she knows to be discriminating against her in order to establish standing.

Viewing the injury as the denial of opportunity to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations of an entity, whether caused by direct interaction with physical barriers or their resulting deterrent effect, is not only consistent with the plain language of the ADA, it is consistent with Supreme Court precedent.  Thus, the Supreme Court in *Bragdon v. Abbott*, 524 U.S. 624 (1998), never suggested that the plaintiff, who had been denied dental treatment due to her HIV status, had to allege an intent to return to Dr. Abbott on a specific date to obtain relief under Title III.  If it believed standing to be a problem, it had an obligation to raise the issue *sua sponte* to assure itself of the litigant's Article III standing.  *DaimlerChrysler v. Cuno*, 547 U.S. 332, 340 (2006); *United States v. Hays*, 515 U.S. 737, 742 (1995).  One commentator has pointed out that, following some courts' narrow approach to standing, the plaintiff in *Bragdon* would have had to wait until the litigation was resolved to get her cavity filled and refuse

to see another dentist to ensure that she maintained standing.  Markey, *supra*, at 185.  This is surely

not what Congress intended in passing the ADA.  Moreover, whether Bragdon had her cavity filled

or not, Dr. Abbott would have been continuing to discriminate against her through his policy of

refusing certain treatments to HIV+ patients, including plaintiff, and this ongoing discrimination

would be sufficient for injunctive relief.

Other Supreme Court cases also support a broader view of injury under Title III.  In

*Northeastern Florida Chapter of the Associated General Contractors of America v. City of*

*Jacksonville, Florida*, 508 U.S. 656 (1993), the Supreme Court held that the injury in fact in an

equal protection case "is the denial of equal treatment resulting from the imposition of the barrier"

or "the inability to compete on an equal footing."  *Id.* at 666.  Thus, a party challenging a set-aside

program in government contracting "need only demonstrate that it is able and ready to bid on

contracts and that a discriminatory policy prevents it from doing so on an equal basis."  *Id.*

More recently, in *Gratz v. Bollinger*, 539 U.S. 244 (2003), the Supreme Court expressly

reaffirmed this holding.  *Id.* at 263.  The Court then applied that holding to the equal protection

challenge against the University's use of race in undergraduate admissions, noting that the plaintiff's

allegations "that the University had denied him the opportunity to compete for admission on an

equal basis" and that "[a]fter being denied admission, [the plaintiff] demonstrated that he was 'able

and ready' to apply as a transfer student should the University cease to use race in undergraduate

admissions" were sufficient to confer standing to seek prospective relief with respect to the

University's continued use of race in undergraduate admissions.  *Id.*

Further, the Supreme Court recognized deterrence as an injury in fact sufficient to confer

standing for prospective relief in *Friends of the Earth, Inc. v. Laidlaw Environmental Services*, 528

23

U.S. 167 (2000).  The Court held that allegations that plaintiffs would like to fish, camp, swim, and picnic in and near a river downstream from the defendant's facility alleged to be polluting, but that they would not do so because they were concerned that the water was polluted by the facility's discharge adequately documented injury in fact sufficient to obtain injunctive relief.  The Court found that such conditional statements – that plaintiffs would use the river if the defendant were not discharging pollutants into it – could not be equated with the speculative "some day" intentions to visit endangered species halfway around the world that was held insufficient in *Lujan*.  *Id.* at 184. Further, the Court dismissed the dissent's reliance on *Lyons*, noting that in *Lyons* it was speculation whether the recurrence of the chokehold "would even *take place*," while it was "undisputed that Laidlaw's unlawful conduct - discharging pollutants in excess of permit limits - was occurring at the time the complaint was filed." *Id.* (emphasis in original).  It continued, "Under *Lyons*, then, the only 'subjective' issue here is '[t]he reasonableness of [the] fear' that led the affiants to respond to that concededly ongoing conduct by refraining from use of the North Tyger River and surrounding areas."  *Id.*  The Court found "nothing 'improbable' about the proposition that a company's continuous and pervasive illegal discharges of pollutants into a river would cause nearby residents to curtail their recreational use of that water-way and would subject them to other economic and aesthetic harms"; instead, that proposition was "entirely reasonable" and, found to be true by the district court, was "enough for injury in fact."  *Id.* at 184-85.[7]

---

[7] In *Lujan*, the Court emphasized that the plaintiffs had not suffered any harm, that the party seeking review must himself have suffered an injury, and that "it is clear that in suits against the Government, at least, the concrete injury requirement must remain." *Lujan*, 504 U.S. at 578.  ADA Title III suits are not suits against the Government, rendering those concerns inapplicable. Further, in his concurring opinion, Justice Kennedy noted that, in exercising its power to define injuries that will give rise to a cause of action where none previously existed, "Congress must at the very least identify the injury it seeks to vindicate and relate the injury to the class of persons entitled to bring

Thus, following the reasoning of these precedents, in an ADA Title III case, the risk of injury in fact is not speculative so long as the alleged discriminatory barriers remain in place, the plaintiff remains disabled, and the plaintiff is "able and ready" to visit the facility once it is made compliant. If the disabled plaintiff returns to the location, the same discrimination will occur until the facility is made compliant. Thus, any disabled plaintiff who alleges an intent to return can demonstrate a non-speculative injury sufficient for injunctive relief under the ADA. Further, just as the *Laidlaw* plaintiffs were reasonably deterred from visiting the river due to the pollution, it is not improbable, but "entirely reasonable" that a plaintiff would be deterred from visiting a public accommodation that is currently discriminating against her. Thus, any disabled plaintiff who alleges that she is being denied the opportunity to visit or is currently being deterred from visiting a public accommodation that is violating Title III alleges sufficient present injury in fact for prospective equitable relief. *See Dean v. Ashing*, 409 F.2d 754, 756 (5th Cir. 1969) (in suit under Title II of the Civil Rights Act by black trailer owners against trailer park operators who refused to rent spaces on account of race, holding that district court "should determine whether the defendants had a policy or practice of not renting space to Negroes" and "[i]f so, and it also appears that any plaintiff was aggrieved by this policy or practice, then the injunction contemplated by the statute, 42 U.S.C.A. § 2000a-3(a), should issue").

Last, the fact that a disabled plaintiff in a Title III case is a tester does not change the analysis or outcome. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) (holding that a tester who

---

suit." *Id.* at 580 (Kennedy, J., concurring). Congress has done so with the ADA, and concerns about "preserving the adversarial process by assuring that both parties before the court have an actual, as opposed to professed, stake in the outcome" are satisfied. *Id.* Further, unlike in *Lujan*, denying standing in Title III cases does result in the Act's having no deterrent effect, since injunctive relief is the sole available remedy.

suffered injury in the form the statute was intended to guard against had standing and "[t]hat the tester may have approached the real estate agent fully expecting that he would receive false information, and without any intention of buying or renting a home, does not negate the simple fact of injury within the meaning of [the statute]."). In *Evers v. Dwyer*, 358 U.S. 202 (1958), the Supreme Court reversed the lower court's dismissal of a case for lack of an actual "case or controversy" in the civil rights context. Plaintiff, who was black, sat in the front of the Memphis public bus, and was ordered to move to the rear. After being threatened with arrest if he refused to comply, the plaintiff left the bus. In finding that an actual "case or controversy" existed, the Court reasoned:

> We do not believe that appellant, in order to demonstrate the existence of an 'actual controversy' over the validity of the statute here challenged, was bound to continue to ride the Memphis buses at the risk of arrest if he refused to seat himself in the space in such vehicles assigned to colored passengers. A resident of a municipality who cannot use transportation facilities therein without being subjected by statute to special disabilities necessarily has, we think, a substantial, immediate, and real interest in the validity of the statute which imposes the disability. *That the appellant may have boarded this particular bus for the purpose of instituting this litigation is not significant.*

*Id.* at 204 (emphasis added). Thus, a disabled tester who experiences the discrimination prohibited by the ADA has standing to seek relief. *See Tandy v. City of Wichita*, 380 F.3d 1277, 1287 (10th Cir. 2004) (recognizing tester standing to seek injunctive relief under Title II related to City's bus system).

**H. Application**

The allegations of the Complaint/Amended Complaint and Plaintiff's Affidavit allege that Plaintiff has visited the Mall and that she encountered ADA violations in the form of architectural barriers that discriminated against her. It is undisputed that the alleged barriers existed at the time

Plaintiff filed her Complaint.   Further, Plaintiff alleges that she is aware of the continuing architectural barriers and that she is being denied the opportunity to visit Defendant's property and enjoy the same goods and services available to the able bodied.   Plaintiff also alleges that she will visit the property as soon as it becomes ADA-compliant.   As demonstrated above, this is sufficient to demonstrate standing at the pleading stage.   Further, though it is not necessary to allege a specific date of return, Plaintiff's Affidavit states that she will return in the Summer of 2011.[8]

Defendant asserts that Plaintiff lives too far away from the Mall to have standing.   Defendant also argues that Plaintiff's allegation that she desires to visit the Mall is not credible because that desire could be fulfilled by other malls and "[i]n reality, Plaintiff is a professional ADA litigator who has no real intention to shop at malls located in Texas."   However, Plaintiff alleges that she travels to San Antonio frequently to visit family, and that she will do so in the future.   She alleges that when she returns to San Antonio, she will visit the Mall as a patron and to determine whether it has been made ADA compliant.   As the Supreme Court concluded in *Evers v. Dyer*, the fact that she may return to the Mall as a tester and for purposes of this lawsuit is irrelevant.   When she returns to the Mall, she will suffer injury due to her disability, and the injury is redressable through injunctive relief under the ADA. Further, to the extent she is deterred from visiting the Mall while in San

---

[8] As noted previously, Plaintiff also invokes § 12182(b)(2)(A)(ii) and (iii), which govern discriminatory policies, practices, or procedures and a failure to provide auxiliary aids and services, respectively.   However, none of the alleged violations of the ADA appear to fall under these provisions.   If the policy is simply not to make required architectural modifications, that would fall under § 12182(b)(2)(A)(iv).   Further, to the extent Plaintiff's Amended Complaint alleges that Ingram Park Mall discriminates against disabled persons "by requiring that they visit a particular, specified store multiple times before their rights vest" and that Defendant discourages disabled patrons from visiting any but the closest store owned by Ingram Park Mall, the Court finds that Ingram Park Mall's decision to challenge certain plaintiffs on the basis of standing is a legal position, and is not, in and of itself, a discriminatory policy or separate ADA violation.

Antonio because of the architectural barriers, that would also be a non-speculative injury sufficient to confer standing.

## I. Scope

Defendant argues that, at a minimum, Plaintiff should be limited to pursuing injunctive relief for the specific claims listed in the Complaint and that relate to her disability.  Courts have limited plaintiffs' standing under the ADA to those architectural or other barriers related to the plaintiffs' specific disabilities.  *See, e.g.*, *Steger*, 228 F.3d at 893.  Some courts have also limited a plaintiff's relief to those barriers identified in the Complaint (though these rulings are sometimes based on a failure to timely disclose additional barriers during discovery).  *See, e.g.*, *Johnson v. Kriplani*, Civ. A. No. 2:06-CV-2054, 2008 WL 2620378 (E.D. Cal. July 2, 2008) ("[T]he Court finds that Johnson lacks standing to assert new ADA violations that were discovered during the discovery period but not specifically pled in his complaint.").  However, other courts have invoked judicial efficiency concerns and defined the plaintiff's injury as the right to visit the facility free from discrimination, thus allowing the plaintiff to pursue relief with regard to all barriers that discriminate against the plaintiff, even if discovered during the litigation.  *See, e.g.*, *Parr v. L&L Drive-Inn Rest.*, 96 F. Supp. 2d 1065, 1077-81 (D. Haw. 2000), *Steger*, 228 F.3d at 894, *Doran*, 524 F.3d at 1042-44.

The Court agrees that Plaintiff should be limited to pursuing injunctive relief to remedy architectural barriers that discriminate against her and similarly situated individuals based on her disability because Plaintiff has not suffered and will not suffer future injury with regard to ADA violations unrelated to her disability.  With regard to whether Plaintiff should be limited to the allegations contained in the Complaint/Amended Complaint, however, the Court finds the issue to be premature, as no other allegations have been made at this time.

**J. 12(b)(6) Motion**

Defendant argues that, even if Plaintiff has standing, her Complaint fails to state a claim upon which relief can be granted because it contains only conclusory, formulaic allegations.  With regard to architectural barriers, Plaintiff states a claim for relief.  She alleges that she is disabled (specifically, mobility impaired), that defendant is covered by Title III, that she visited the property and encountered specifically enumerated architectural barriers, and that she was discriminated against on the basis of her disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of Defendant's facility.

However, as mentioned previously, Plaintiff fails to state a claim with regard to an alleged failure to make reasonable modifications in policies, practices, or procedures or the alleged absence of auxiliary aids and services.  Auxiliary aids and services are generally things such as interpreters, note-takers, transcription services, written materials, telephone handset amplifiers, assistive listening devices or systems, telephone compatible with hearing aids, closed caption decoders, open and closed captioning, TDDs, and videotext displays.  28 C.F.R. § 36.303.  Plaintiff has not alleged any auxiliary aid or service that she required but was not provided.  Nor has she alleged the existence of a policy, that she requested a modification of such policy, that the requested modification was reasonable, or that it was denied.  *See Johnson*, 116 F.3d at 1059.  Accordingly, Plaintiff fails to state a claim with regard to these violations.

**Conclusion**

Defendant's Motion to Dismiss (docket no. 7) is GRANTED IN PART and DENIED IN PART.

Defendant's motion to dismiss under Rule 12(b)(1) for lack of jurisdiction is DENIED.

29

Defendant's motion to dismiss under Rule 12(b)(6) for failure to state a claim is GRANTED IN PART and DENIED IN PART.  Plaintiff fails to state a claim with regard to alleged violations of 42 U.S.C. § 12182(b)(2)(A)(ii) (failure to make reasonable modifications in policies, practices, or procedures) and (iii) (absence of auxiliary aids and services), but does state a claim under 42 U.S.C. § 12182(b)(2)(A)(iv), (v) (regarding architectural barriers).

It is so ORDERED.

SIGNED this 10th day of August, 2010.

_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE